The next case today is Dahua Technology USA, Inc. v. Feng Zhang, Appeal No. 201107. And Dahua Technology USA, Inc. v. Feng Zhang, Appeal No. 20138. Attorney Flam, you may proceed. Thank you. Good morning, Your Honors. My name is Benjamin Flam. I represent the appellant, Cross Appellee, Mr. Zhang. Your Honors, may I reserve two minutes for rebuttal? Yes. Thank you, Your Honor. May it please the Court. Your Honors, at the time Dahua sought to separate from Mr. Zhang, the stakes were high, very high. For Dahua, half a billion dollars in revenue was on the line. For Zhang, millions of dollars were on the line. The company owed him $1.6 million in cash and stock, free and clear. And he told them that his confidentiality alone was worth millions that day. Zhang's position was clear. It would take millions for him to sign on the dotted line. Everyone knew that Zhang was free to go work for Dahua's largest competitor, and they needed to lock him down that very day to prevent him from doing so. After all, Zhang had increased Dahua's revenue by half a billion dollars in only 20 months, and he could do the same for their competitors. That's why Fu, the company's billionaire founder, flew into the U.S. from China with his legal team, with outside counsel on speed dial, to negotiate the deal with Zhang in person. The stakes were that high. Counsel, I'm going to sound like my colleague, Judge Lopez, in an earlier argument. You can choose to spend your time on going through the facts, or you can start to address the legal issues, of which I think there are three. First is the choice of law that should be applied here. The second is, was there a unilateral mistake? And the third is, even if there was a unilateral mistake allowing the reformation of the contract, whether your opponent was entitled to any damages, as the district court did not provide those damages. All right? Thank you, Your Honor. I will turn right into the legal inquiries. Turning first, Your Honor, to the theory of mutual mistake that they pled in their complaint. Do you mind following Judge Lynch's laying them out and start with the choice of law? Because it's a little hard to know how to get our bearings on contract law. We don't know which substantive contract law we're supposed to be looking at. You say it should be Virginia, not Massachusetts law. Yes, Your Honor. That's correct. And I'm pleased to go in Judge Lynch's order. With respect to the choice of law, it's clear as an initial matter that the result is the same. The standards for mutual and unilateral mistake are respectively clear and convincing evidence and full, clear, and decisive evidence. I thought you said that in the Virginia law you had to prove fraud for unilateral mistake, but not for Massachusetts law. That's correct. Fraud or inequitable conduct. That's correct, Your Honor. DAWA still has to establish the unilateral mistake with full, clear, and decisive evidence. But if we got to the question of unilateral mistake, you think Virginia law is more favorable to you than Massachusetts law, correct? Yes, Your Honor. We also think that Virginia law applies given the district court applied Massachusetts law. Yes, Your Honor. About five minutes. We believe that the district court applied the secondary analysis. The first analysis, as Massachusetts follows the restatements when it sits in diversity, is, is there a substantial contact between the deal and the state that was chosen? And does it offend any other state's rights to follow the choice of law? There's no argument before this court that Massachusetts policy is offended. And with respect to the choice of Virginia law, we we argue that the contacts are indeed sufficient, Judge. Their outside counsel who wrote the agreement was in Virginia. She testified that they discussed putting Virginia as the choice of law into the agreement and that that. I thought she said it was a mistake on our part and a mistake that I didn't catch. That this was sort of a standard clause used in other contracts. The district court found that, in fact, the locus of the activity was in Massachusetts. You may well be right that the legal test that the district court articulated was a bit too narrow. But you have not presented any argument that I'm aware of that it was unreasonable for Massachusetts to apply its state law here, given the testimony of record that this was just another mistake. So, Your Honor, that's what the in-house lawyer testified. The outside lawyer who wrote the draft of the agreement said she couldn't recall when they discussed it, but they had discussed using Virginia law. It's also important to note, Judge, that the second agreement that was signed that same day for the consultancy, they specifically chose Massachusetts law, which is further evidence that Virginia was was chosen affirmatively for the severance agreement. I'd like to pursue this unilateral mistake issue. I'd like to understand who was actually negotiating the terms of the separation or severance agreement. It is my impression that the discussions took place entirely between the principals, Mr. Zhang and Mr. Fu, if I'm pronouncing it correctly. I know there were all these other lawyers involved, but in terms of trying to reach an understanding of what the terms would be, that then the lawyer should memorialize, who was engaged in those discussions? Your Honor is correct. It was the principals, Fu and Zhang. The only discussion took place the day before the signing at Fu's hotel. Certain things were agreed upon, as we know, from Joint Appendix 117 to 120. First, Zhang would stay on as a consultant to finish up a merger as a consultant at 240 K per year for two years. Second, Fu would, quote, take care of his employment agreement and, quote, take care of his outstanding stock worth one million at the time. Finally, Fu would, quote, treat Zhang well for any other restrictions, i.e. non-compete confidentiality, etc. Zhang's parting words from that discussion were as follows. If we need to sign a new agreement, it depends on what you offer me and how much you offer me. So this $680,000 figure, what role did that play in these initial discussions between Mr. Zhang and Mr. Fu? You seem to suggest that your client always made it clear that $680,000, which I gather represented what he was still owed under the compensation agreement. And perhaps that $680,000, was that what he was still owed under the compensation agreement? Is that where that figure comes from? That's correct, Your Honor. He had 16 months left on his employment agreement, $680,000 of salary under there. But it's critical, Your Honor, to note that at that hotel meeting, the only actual negotiation, no dollar figures were discussed for the severance. They subsequently went to the office where Fu called Zhang into an office and slid an agreement across the table, which said $680,000 total. Zhang rejected that as insulting and humiliating, told them to get him a better deal, and didn't even dignify it with a counter. He got up and left the room. He walked down the hall and told the human resources executive who came in with Fu from China and said— That's time. Go ahead and finish. Thank you, Judge, and said to that human resources executive, my confidentiality alone is worth millions. That juxtaposed with the fact that they already owed him, it's undisputed, $1.6 million in equity and cash. When he subsequently was presented with a deal for millions, he had no reason, especially at summary judgment, Your Honor, to know that any mistake has been made. Okay. I'd like to pursue this a bit more. When did the provisions that require confidentiality, non-compete, non-disclosure, never part of the original employment agreement, when did those provisions enter into the agreement? Were they in that separation agreement, which he rejected out of hand, or did they appear for the first time in the severance agreement that they ultimately assigned? When did those provisions enter the documents? Your Honor, those provisions entered the documents the first time they made the offer, that agreement that he rejected. That was the first time he had seen those. That's why he walked down the hall and told the HR executive that his confidentiality alone was worth millions to him. That's undisputed in the record, Your Honor. So is it your position that with respect to the agreement that he signed, that if that $680,000 represented the total compensation that he was owed, apart from the consultancy agreement and the stock, that there would have been no difference between that and the agreement that he simply rejected? Is that your position? That is accurate, Your Honor. He was already entitled to that $680,000 without restriction under his employment agreement. When did the consultancy agreement enter into it? Was that first proposed along with the severance after the separation agreement was rejected, or was that proposed along with the separation agreement too? So, Your Honor, if I could take you back to answer your question directly to that discussion they had at the hotel. The first thing Fu told Zhang was, ìWe're removing you from your position. How would you like to come back and work at the home office in China?î Zhang replied that his children and family were in school here. He's a U.S. citizen, so he couldn't go back now, maybe in a couple of years, at which point they started a discussion conceptually about what to do next. The first thing Fu said was, ìWe need you to stay on as a consultant.î There was a merger, specifically the Project Mohawk deal that's in the record, Your Honor, that they wanted him to finish and to advise on other high-level corporate strategy issues. They agreed on a salary of $240,000 for two years. Then they shifted the discussion to what else, and that what else was, as I suggested earlier, again, it's on joint appendix pages 117 to 120. You said, ìThen what happened?î Then they give them the separation agreement. Was the consultancy agreement, a contract for the consultancy agreement, put forward with the separation agreement or not? The consultancy and the $240,000 salary affixed to it was in that deal he rejected flatly, yes, Your Honor. He rejected that, I gather, because that contained an at-will provision. Is that correct? That is one of the reasons he rejected it. If we look to his testimony, Your Honor, he rejected the whole deal out of hand, not even dignifying it with a counter because the whole thingó Leon Saul, you're over time. Please answer directly and then end. Thank you, Judge. I've lost the question. I asked whether his rejection of the consultancy agreement was based on its inclusion of an at-will provision. Is that correct? That was one of many reasons he rejected it, according to his testimony, Your Honor. Judge Lynch, I have one further question. Yes, go ahead. Your account, which I understand and you've laid it out well, if we thought, nonetheless, that the manifold increase in the actual contractó if we thought that that supported a conclusion that your client should have known that was a mistake, what would follow? What I'm not quite understanding is you seem to be making the argument that there's no basis for saying they had agreed to $680,000, so there would be no basis for a reformation to $680,000 because that's what he rejected. He rejected $680,000 when it was better for him than the $680,000 plus the clawback provision and the confidentiality and all that other stuff. That's not a plausible agreement to the $680,000, so I understand that. But what would then follow for you if we concluded that he should have known it was a mistake, so there was unilateral mistake, but you're right, they never agreed on $680,000? That would just seem to render there to be no contract at all, and you get nothing. Well, two possible outcomes there, Your Honor. Because reformation is an equitable remedy, this court can find, first, that he should have known, which we dispute, and still decline to reform the contract because the alternativeó Yeah, but then what happens? What happens if you don't reform it? Don't you then just have no contract? What would you get? Well, if you don't reform it, then you leave the contract in place, even ifó Even if we conclude there was a unilateral mistake? Yes, Your Honor. Under one beacon and its progeny, the court can make that conclusion. The court can also void the entire contract if it's so inclined, finding that there was no meeting of the minds, at which point Zhang could haveólook, he can't get back the 16 months he served on his non-compete. He can't get back the fact that he wasn't able to publish, but he can at least go after the $1 million-plus in stock that they owe him. And he'd be free from all these other requirements to have non-compete, confidentiality, etc. Unfortunately, he's already served the 16-month non-compete. He would be free from his confidentiality, but he's already paid the price. He's already held up his end of the bargain. So we believe tható I'm not seeking any remedy for that. I'm sorry? No, I got it. I got it. Thank you, Your Honor. Thank you. Attorney Flam, if you could mute your audio and video, and Attorney Rosenfeld, if you could unmute and proceed. Thank you. Daniel Rosenfeld, Counselor for Apelli Dawa Technology USA, Inc. Good morning. May it please the court. I'll begin by turning to the first question that the court raised, unless the court prefers meó No, go ahead. You have limited time. Understood. So the first question the court raised was the choice of law issue, and I'd like to address that. The law is clear that Massachusetts courts will uphold the party's choice as long as the result is not contrary to public policy and as long as the designated state has some substantial relation to the contract. I thought there was a separate thing, which the restatement provides, in which there's no indication Massachusetts law rejects that when the parties have chosen a non-Massachusetts forum, even if there is no contact to Massachusetts, as long as there's a reasonable basis for that choice, they'd enforce what the parties chose. So I think that the Claxton case asks us to examine this under Massachusetts lawó Massachusetts law rejects the restatement's position that when the parties select a non-Massachusetts state, if there is a reasonable basis for that selection, even if there is no contact to Massachusetts, we will enforce what the parties selected. I think the Steranko case does in some form reject that, Your Honor, because it says that as long asó It wasn't presented with an argument that the parties had selected it and had a reasonable basis for choosing a non-Massachusetts forum, so that case doesn't answer this question. And since the restatement provides that they will allow us to enforce it, why would we assume Massachusetts would reject the restatement? Because there is no substantial relation, Your Honor, and there is no basis for thinking that the parties had actually chosen Virginia law. Can I ask you about that? Yes. A little bit concerning to me is that if I understand the course of dealing here, it was your counsel who was located in Virginia who drew up the contract, who chose to do it, and there's testimony that that's the standard thing he does, is that he picks Virginia, and he's a Virginia-based attorney, and the worrisome thing is that the employer can select a forum, have it there, then finds out in the course of the dispute that that forum's law is not going to be so good for it, and suddenly says, I don't know why we chose that, and then we're not supposed to enforce it. That's very troubling to me. That gives you kind of a free look at whether you want to keep the agreement. If it helps you, you will, because then you just testify, yeah, it would be really good to have a Virginia attorney knowing Virginia law, but if it doesn't help you, you say my attorney can't remember why he did it. Well, the facts are uncontested, Your Honor. Ms. Lurigulski, who did the initial drafting of the agreement, the outside lawyer, testifies that she doesn't know why Virginia law was put in there. I think it's reasonable for one to assume that the reason it was there is because she sits in Virginia. Why wouldn't that be a reasonable basis? You picked a lawyer to do it who knows Virginia law. Because, Your Honor, that is not a relationship between the parties and the state of Virginia. The fact of the matter is that all of the locus here was in Massachusetts. Dower doesn't have and has never had a place of business in Virginia. Mr. Zhang never worked in Virginia. Mr. Zhang's place of employment with Dower and his office was in Massachusetts. You're just ignoring the part of the restatement. The parties, for a reasonable reason, can select a place that has no contact to the form state. So the fact that there's no contact to the form state is baked into the restatement. And the question is why is it unreasonable for the parties to choose, hey, we have a lawyer drafting who knows Virginia law. That's why we picked Virginia law. Both parties know it. Why wouldn't we just enforce it? It's not against public policy that I concede to do that. I would agree with Your Honor if the testimony was that the chart parties had chosen Virginia law. Here, the testimony is to the contrary. Here, the testimony is that they don't know how the choice of law of Virginia got into the agreements and that that was, in essence, some form of a mistake. The Virginia lawyer does not testify that there is no testimony in the record that she ordinarily uses. Do we just have to believe her testimony? I think there is no basis for any contrary decision, Your Honor. The undisputed testimony. I thought there was evidence in the record that it was per standard practice to choose Virginia. Five minutes remaining. She does testify, Your Honor, that she on occasion chooses Virginia law. On occasion? Is that her testimony or that she often does it? I don't believe she testifies that she often does it, Your Honor. I do not believe there is testimony to that effect. And in fact, her testimony is that she doesn't know why Virginia law was used in the agreement. The inside counsel for DAWA testifies that there was no discussion that she recalls about the choice of Virginia law. And neither Mr. Zhang nor Mr. Fu, who actually had the conversations about what the agreement should contain, had any discussion about the choice of law that would be made in the agreement. Counsel, I'd like to ask you about the unilateral mistake issue. What seems to considerably drive the district court's decision is the notion that it's simply preposterous that your client would end up agreeing to a deal that multiplied from a million plus to over $10 million. What kind of money Mr. Zhang would get? Yet it seems equally incredible, I would suggest, to think that Mr. Zhang, and this is viewing, as you're supposed to do on summary judgment, the record in the light most favorable, or at least to draw inferences that are favorable to him, that he, having made very clear from the outset of the negotiations that he was not going to accept a deal that would only pay him $680,000, to which he was already entitled, that in the end, he would sign a document that would pay him $680,000. That $680,000 figure represented the total compensation that he was owed. The argument that that's what the deal was and that he accepted that seems to belie the entire history of the negotiations, however brief, between Mr. Zhang and Mr. Fu. What makes that a credible argument in light of the history of negotiations that he would have understood that the $680,000 was all he was going to get in compensation? Two things, three things I would say to that, Your Honor. First, the negotiation that occurred over the morning and into the evening of that day between Mr. Fu and Mr. Zhang did not include only $680,000 in compensation. First, it included a component for payment of the salary that had been left unpaid on the former contract. That was the $680,000. It included a component under which Mr. Zhang would receive a payment in cash in China for his stock. That portion was not reduced to writing, but it is undisputed, Your Honor, that Mr. Zhang did in fact receive that pursuant to the verbal agreement that was made between Mr. Zhang and Mr. Fu during the discussions. Mr. Zhang also received $240,000 for two years, so $480,000 additional that he was not entitled to under what was his existing agreement. But he was supposed to do additional work for that. Well, that's correct, Your Honor, but the amount of additional work was undetermined. And quite frankly, that was in large part the consideration that Mr. Zhang was being offered to enter into the separation and severance arrangement. Did the separation agreement that he rejected not also provide or did it preclude him from getting those other components, the stock payment and the $240,000 consultancy agreement? No. If the answer to that is no, I think that just reinforces the question Judge López was asking you, which is you say there was a course of dealing between Fu and Zhang, which you agree included $680,000 plus the payment of the stock and the $240,000 consultancy agreement. He then gets a separation agreement for $680,000 that doesn't preclude either the stock or the consultancy agreement. He rejects it. We're then supposed to believe that when he gets another agreement, he was accepting $680,000 plus stock and the consultancy agreement. Why would that make sense? If anything, the severance agreement had additional terms which were unfavorable to him, including a clawback. Your Honor, it had aspects that were both favorable and unfavorable to him. For example, it included an acceleration provision that could have been invoked. May I just finish the answer, Your Honor? Yes, certainly. In addition to that, the testimony is clear that when Ms. Haiyan Yu, the in-house lawyer for the company, came into the room and the earlier agreements that were a separation agreement and a consulting agreement were rejected, she understood Mr. Fu to be accepting the sum of money and that all he was rejecting was the at-will nature and the nature of the consultancy versus an employment arrangement. Isn't that a jury question? Your Honor, I don't think it is a jury question. I think the question really comes down to what was negotiated and whether or not those negotiations mattered. Not what Mr. Zhang says was in his mind, which he did not verbalize at the time to Mr. Fu or anyone else in the negotiation itself. Remember, Mr. Zhang's counsel says Mr. Zhang only negotiated with Mr. Fu. So, any discussions that Mr. Zhang claims to have had with someone else are irrelevant to what Mr. Fu believed was the situation. Why does that woman that you just referenced, why does her testimony matter then? Because she was in the room and she heard directly from Mr. Zhang about why he was rejecting the agreement at hand and Your Honor asked a question that went to why it would be logical for that rejection to have occurred without any increase in the monetary sums. So, that leads logically to this question. Suppose, nonetheless, that there is a unilateral mistake, at least as to what is a pretty blatant mistake as to the monthly payment sum and whether the reformation of the contract was an equitable remedy here. I assume that my memory is that this is characterized as an equitable remedy, in which case our review would be for abuse of discretion. When Judge Barron asked the question of your opponent, I did not hear an assertion per se of abuse of discretion, but I did hear some argument as to why, from their point of view, it was inequitable. Would you please respond to that argument? Well, there's no question that the remedy of reformation is an equitable remedy, Your Honor. And to the extent that equitable remedies are reviewed under an abuse of discretion standard, the court should apply that standard. If, on the other hand, the court determined that, for example, there had been… No, no, at counsel, yes, all of that's a given. Now, why should we disregard or reject his arguments made in response to Judge Barron's question that this is an inequitable position to leave him in? Well, Your Honor, it's simply not an inequitable position to leave him in. This was the agreement that was negotiated and agreed upon between the parties. To the extent that he has, after the fact, concern over what he actually agreed to at the time, that's not… The question Judge Lynch is asking is if we disagreed with many of your premises and we thought that he had not agreed to $680,000, if we thought that instead it was a unilateral mistake that he should have known about, why would it be equitable to hold him to a deal that was the equivalent, if not worse, than what he had already rejected? Because in a unilateral mistake case, one attempts to put the parties to the positions that were actually negotiated. Here, the evidence is that the only numbers that were discussed were the numbers that the company is asking the court to… Counsel, you seem to be arguing really that this is a mutual mistake case and that it is that the solution reached by the district court was just fine because it is consistent with the agreement that they reached. There was a mutual mistake and the real deal was $680,000. That seems to be your position. Is that your position that this was a case of mutual mistake? So, the deal… So that the affirmation by the district court was consistent with that mutual mistake? No, not necessarily, Your Honor. In a mutual mistake, if this were a mutual mistake, then Mr. Zhang would not have known that a mistake had occurred. Here, he should have known that a mistake had occurred. He should have known that the mistake that occurred was that the $680,000 over a period of 16 months that had been intended had been changed to $680,000 for 16 months. In fact, he should be held to that number because he should have known that it was a mistake and remained silent. I'll defer to Judge Barron, but I do have one question that's slightly different. Go ahead. The analysis you've just done brings us to the equitable question, and you're not still answering why. To say that he should have known is to say that he did not know, which means there can't be a meeting of the minds between them. So then the question is, why is it equitable to hold him to what he should have known? One possibility is, on the facts of the case, it is equitable. We happen to have a case where what he's being held to is the precise number he rejected in the separation agreement, which makes it at least facially seem arguably inequitable to give him that number. You still have not made an argument about why it would be a good exercise of discretion in this type of case to hold him to the number he rejected. I suppose, Your Honor, the answer to that question really depends on how one answers whether or not what he should have known. Since our argument is that he should have known that the company had intended only to offer $680,000 over 16 months and not for 16 months, he should be held to that number, and that would be equitable. Your opposing counsel suggested that he would be happy with an outcome that just invalidates the whole contract on the basis of this unilateral mistake. Of course, he thinks there was no unilateral mistake. So why is holding him to a reformed contract equitable in light of the alternative of, well, sorry, guys, you have no contract? You can say, well, he at least gets money under what the district court did. If there is no contract, he gets nothing. Then, I guess, there is a future of lawsuits. I suppose there is an argument that, my gosh, this thing has been litigated for several years, and there is nothing equitable about allowing a new round of litigation here. This, because he gets something, is much preferable to he gets nothing, but maybe if the statute of limitations doesn't bar it, he can bring another lawsuit. Well, I suppose that that's true, Your Honor, that if the decision of the court were to determine that there was no meeting of the minds, and therefore there was no contracts. No, no, no, no, stop. You have mistaken my premise. My premise is there was a unilateral mistake. Then there is an equitable choice to be made as to whether you reform the contract or you just void the whole contract. And when Judge Barron asked your opponent about that, to my surprise, he seemed to be willing to accept an outcome here, avoiding the entire contract, which would mean he gets nothing. So, that's the context in which we're asking these questions. Certainly, Your Honor, the company does not think that that would be the equitable result here. The equitable result is the one that would put the parties in the position that is fair. The fair position that the company notes is the one that it believes the contracts called for, which would mean that the payments that the company has already made fulfilled its obligations. Okay. I have one last question. If we thought Virginia law did apply based on the fact that the contract says that, the argument from your opponent is that under Virginia law, there needs to be a showing of fraud in order to prove unilateral mistake. May I please? I thought the answer was fraud or inequitable to apply. Under Virginia law, the law is fraud or any other inequitable conduct. And so, quite frankly, if the facts were as we believe that Mr. Zhang knew or should have known of the mistake, that is still inequitable conduct. That's what I'm asking. Under Virginia law, do you have any authority that signing something just because you should have known is not just carelessness but is inequitable? No, nothing specific to that effect, Your Honor. So, why would we conclude that that's what Virginia law holds then? Because we believe the evidence here is that he knew or should have known. And if you should have known something, it's inequitable to sign it. Usually, we treat that as carelessness, not inequitable action. That's negligence. You should have known standard. That's not inequity. Your Honor, it would be inequitable for Mr. Zhang to take advantage of a 16-fold increase in the amount that had been included in the agreement. If this had been an extra $100,000, one could argue that that is just mere carelessness. I would suggest to the Court that here where the number had been multiplied 16-fold and went from being a $680,000 payment over 16 months to an approximately $11 million payment over 16 months, that that required something more than simple misunderstanding on the part of Mr. Zhang, particularly in light of his testimony about the conversation with Mr. Fu. Thanks. Okay. Thank you. Thank you. Mr. Rosenfeld, please mute your audio and video at this time, and I believe we're going to have rebuttal. Yes. Mr. Phlam, welcome back. Two minutes. Pleasure to be back. Thank you, Your Honors. As an initial matter, voiding the contract, Your Honor, is not the right answer here. It's better than, as Dawah wants, sticking him with these restrictive covenants in perpetuity. The right answer is enforcing the agreement as written. The law requires that Dawah must establish proof by full, clear, and convincing evidence, not that Dawah made a mistake, but that Zhang knew or should have known about it by full, clear, and decisive evidence at the summary judgment standing. Okay. Do I understand you to be withdrawing any suggestion that your client is making an argument that the entire contract is void and that was the appropriate remedy? That would be the secondarily appropriate remedy. The appropriate remedy here, because… You've already told us what you thought the appropriate remedy was. All right. So your number two is voiding? Yes. Number two is voiding. That's correct. Okay. Just because of the sole bare fact that they increased their number a lot, that doesn't mean as a matter of law, by clear and convincing evidence, that Zhang should have known. In fact, the monthly payments in the history of these parties' dealings is almost irrelevant. They never paid on time. He never complained, and eventually they caught up with him in lump sums, just like when he flew to China, they gave him a lump sum, albeit in a bag of cash, but that was the history of the dealings between these parties, is they promised to pay him one thing. They never did. They always shortchanged him. I don't see how that helps you here. That isn't what happened with respect to the 16-fold increase. Are you saying that it's somehow justified because they delayed in paying one month? I didn't understand that to be the record. No, Your Honor. It's justified because he told them that his signature for those restrictions was worth millions to him. Okay. You're back to the same argument you made before. Is there anything else? Yes, Your Honor. It's important to note that their own internal negotiation blueprint admits that they had to pay him more than the 680 they owed him. That's undisputed. And furthermore, after Zhang tells them he's worth millions, the inference here at summary judgment, the proper one, is that they skipped to the endgame and put the millions on the table that he was desiring because they needed to lock him down that day. Fu flew in from China to do this in person. He could have left and went to the next biggest competitor the next morning. They had to lock him down. This has got to go before a fact finder because whether or not Zhang knew or should have known is a question of his state of mind, which I would argue respectfully. First, they haven't established by clear and convincing or full, clear and decisive evidence. And secondly, at a minimum, a fact finder has got to hear their testimony and make that determination. Counsel, they should have known. It is striking that for four months, he received a payment that precisely tracks their understanding of the deal. Isn't that correct? For four months, he got one sixteenth of the overall payment. He got the $20,000 on the consultant agreement. That, again, precisely tracks what their understanding was. You talk about decisive, full evidence. That seems to strongly support the notion that, you know, he understood that was the deal. And to the extent that the documents suggested something else, he would have understood or should have understood that that was a mistake. Your Honor, there's two critical facts which which require a fact finder on that very question. First, as I stated earlier, the past dealings between the parties were they underpaid him. He kept his head down. Cultural considerations undisputed. Again, he never complained and they eventually caught up. Second, and perhaps more importantly, during that period of underpayment, it is undisputed that Mr. Zhang went to see a tax planner, a financial planner to ascertain how best to manage the liability on a $10 million payment he was receiving from a Chinese company. He believed it was coming. He went and it's undisputed. He saw that tax planner in December of 2017. Someone who doesn't believe the money is coming doesn't do that, especially at summary judgment. Your Honor, he does. If he is trying to take advantage of the situation and hopes that he's not going to be caught here. Exactly right. Your Honor, there is that potential inference. But at summary judgment, we draw this in Zhang's favor. And Your Honor just pointed out exactly what I'm thinking, which is it's got to go before a fact finder to determine which of those is the case. I believe Judge Barron has a question. Last question I had is just at some point there is a offer to change the severance contract and have a $900,000 payout. One thing that is just curious to me about that is what is your account of why the company is seeking to now have it be changed to $900,000? What were the conditions in that? I just don't understand why the company would suddenly come in if they thought they only owed $680,000 and suddenly say, well, would you take $900,000? I just don't get it. Your Honor, there's two critical points there. I'm happy to clarify for the court. First of all, $910,000 was the remaining amount on the $680,000 they wanted to pay plus the remainder of the $240,000 on the separate consultancy agreement. So what they were saying was we're not going to pay you millions that we agreed to pay you. We're just going to pay you what we want to instead. Go ahead and sign this. And by the way, all your restrictions, the clawback of your guaranteed monies, the non-compete, the confidentiality, we're keeping that too. At that time when he rejects – your client rejects the $900,000, right? That's right. What does the evidence show about his state of mind when he rejects the $900,000? The evidence shows that he believed he was entitled to the $10 million as bargain because his response was no, pay me what we agreed to. And that's critical, Your Honor, because, again, the past practices of the parties create the necessity for a fact finder. They never paid him on time. He never complained. The only time he actually speaks up on his own behalf and complains is when they affirmatively say we're not going to pay you what we owe you because until that point in time, they always eventually caught up with him. One last one. On this inequitable point under Virginia law, do you have anything to say on that? Why isn't there an argument that if you should have known and yet you nonetheless go ahead and sign and you should have known that that's inequitable as opposed to just careless? So I agree with Your Honor that that that would be careless is under these facts because Zhang told them it would take millions to get him to sign for those restrictions. And they offered him millions. Having said that, Judge, that's a question for a fact finder as to whether or not he should have known. Because thank you. All right. Thank you. Thank you both. Thank you, Your Honors. Council may disconnect meeting. Also, for this case may disconnect from.